IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No.  20-cv-03825-RBJ

LENA K. HUSTED,

      Plaintiff,

v.

KILOLO KIJAKAZI, Acting Commissioner of Social Security,

      Defendant.

---

## ORDER AFFIRMING THE DENIAL OF BENEFITS

---

This matter is before the Court on review of the Social Security Administration ("SSA") Commissioner's decision denying plaintiff Lena Husted's application for Social Security Disability Insurance ("SSDI").  Jurisdiction is proper under 42 U.S.C. § 405(g).  For the reasons below, the Court AFFIRMS the decision of the Administrative Law Judge ("ALJ").

## I.    BACKGROUND

Lena Husted ("plaintiff" or Ms. Husted) first filed a claim for SSDI benefits on May 7, 2013.  ECF No. 14 at 129.  In that claim, Ms. Husted alleged that her disability began on June 1, 2011.  *Id.*  Ms. Husted had experience working as a dispatcher and a waitress/hostess.  *Id.* at 79. She last worked in dispatch in 2005.  *Id.* at 540.  She last worked as a waitress in 2011.  *Id.* at 543. Though she had struggled with neck and back pain all her life, she testified that in 2011 the pain increased to the point that she could no longer work.  *Id.*  Ms. Husted's claim is for the

1

period from the onset date of her alleged disability to the date on which she was last insured: from July 1, 2011 to December 31, 2016. *Id.* at 500.

Ms. Husted's claim for SSDI was initially denied at the state agency level. Following this denial, Ms. Husted requested a hearing. *Id.* at 105. An ALJ presided over the initial hearing on March 10, 2015 and rendered an unfavorable decision on April 22, 2015. *Id.* at 8. Ms. Husted appealed and ultimately the district court remanded to the ALJ for a second hearing on April 3, 2018. *Id.* at 529. The ALJ issued a second unfavorable decision on July 2, 2018. *Id.* Ms. Husted appealed again, and the district court remanded a second time. An ALJ heard the case for the third time on November 19, 2019 and rendered a third unfavorable decision on December 9, 2019. The appeal from that decision is currently before the Court.

### A. <u>Ms. Husted's Treatment History</u>

Ms. Husted's medical and treatment history is extensive. The record contains over a thousand pages of medical records and opinions from both treating and non-treating sources. Ms. Husted was diagnosed with degenerative disc disease on May 27, 2011. *Id.* at 212. On December 3, 2012, Ms. Husted was diagnosed with bipolar disorder and post-traumatic stress disorder (PTSD). *Id.* at 234.

In the months and years following her diagnosis for degenerative disc disease, she continued to see doctors regarding her back and neck pain. Her initial diagnosis was for "mild to moderate degenerative disease in the mid thoracic spine." *Id.* at 212. Ms. Husted underwent a cervical spine MRI on October 29, 2012—the initial, unsigned report from the Radiology Department at Heart of the Rockies Regional Medical Center indicated that she had moderate

2

degenerative disc disease.  *Id.* at 215.  That same day, she underwent a Lumbar Spine CT.  *Id.* at 217.  The report from that procedure, signed by Dr. Daniel Wardrop, indicated only "very mild degenerative disc disease of the mid- and lower lumbar spine.  *Id.*

On February 11, 2013, Ms. Husted received a steroid injection in her lumbar spine at Littleton Adventist Hospital pursuant to instructions from Dr. Robert Bess.  *Id.* at 226.  Before this procedure, she reported a pain level of eight out of ten; after the procedure, she reported pain of two out of ten.  *Id.*  On that same day, she underwent a second lumbar spine CT, which noted no significant abnormalities in her lumbar spine.  *Id.* at 228.  A third lumbar spine CT was performed on March 12, 2013, which yielded the same results as the second.  By June 11, 2014 Dr. Bess recommended an "L5-S1 decompression" and "posterior spinal fusion with pedicle screw instrumentation with or without interbody fusions."  *Id.* at 352.  Ms. Husted never underwent the surgery.

Throughout this period, Ms. Husted also saw her general practitioner, Dr. Wayne Callen. Dr. Callen repeatedly noted Ms. Husted's back and neck pain.  *See id.* at 250–290.  However, at several points, Dr. Callen also noted that her pain was ameliorated by various medications.  *See, i.e., id.* at 252.  Ms. Husted received treatment and examinations from physician assistant Linda Lee, from Dr. Callen's office, for a few months in the fall of 2012.  *Id.* at 252.  Ms. Husted also received treatment and examinations from physician assistant Jacqueline Duba, beginning in 2014 through summer of 2016.  *Id.* at 1125.

On August 11, 2014 Ms. Husted had another lumbar MRI completed.  *Id.* at 472.  The results of that MRI were that Ms. Husted's lumbar spine was essentially normal for her age.  *Id.*

More specifically, the MRI showed that she had minimal disc desiccation at the L2, L3, L4, and L5 vertebrae. *Id.* at 471. Over multiple examinations, Ms. Duba found that Ms. Husted had normal psychiatric results, with appropriate mood and affect. *See id.* at 1143. Ms. Duba filled out a Med 9 form indicating that Ms. Husted was disabled due to her chronic back and neck conditions. *Id.* at 1144.

Ms. Husted's treatment history following her diagnosis with depression and PTSD is more protracted. She initially sought treatment on December 8, 2013 at West Central Mental Health Center ("West Central"), where she received her initial diagnosis. *Id.* at 233. However, there are no further treatment records regarding Ms. Husted's mental health from West Central. Ms. Husted did indicate to Dr. Callen that she was continuing mental health treatment. On December 18, 2012 Ms. Husted told Dr. Callen that she was seeing a counselor at West Central named Anna. *Id.* at 252. Dr. Callen continued to prescribe medication to treat her anxiety and depression. *Id.* at 253.

On April 7, 2014 Ms. Husted again sought treatment for her mental health ailments at West Central. *Id.* at 334. She acknowledged prior difficulties in attending therapy and counseling—she told the provider, Anna Lauer Roy, "I know that before I came and then made excuses and didn't come." *Id.* at 335. At this visit, her diagnosis of PTSD was confirmed, and Ms. Roy also identified Bipolar II Disorder as a clinical concern for Ms. Husted. *Id.* at 334. She was subsequently discharged from treatment at West Central on September 15, 2014. *Id.* at 337. This discharge was a result of Ms. Husted's failure to attend scheduled services and to respond to

calls and emails regarding treatment. *Id.* No further mental health treatment occurred in the period at issue, according to Ms. Husted's medical records.

### B. Opinions from Examining DDS Providers

Ms. Husted was examined by several different doctors on behalf of Disability Determination Services (DDS). Dr. Laura Moran examined Ms. Husted on November 18, 2013. Dr. Moran found that Ms. Husted had normal range of motion in her cervical, thoracic, and lumbar spine. *Id.* at 323. She found that Ms. Husted could alternate between sitting, standing, and walking as needed for eight hours a day. *Id.* at 325. She found that Ms. Husted could lift and carry up to twenty pounds but could only bend "on a one-time basis." *Id.* Dr. Moran also found that Ms. Husted could "hear, speak, and travel independently, do all daily self- care activities and repetitive motions with her hands. *Id.*

On December 24, 2013, Dr. William Morton, a licensed clinical psychologist examined Ms. Husted on behalf of DDS. *Id.* at 326. The focus of his examination was Ms. Husted's mental health. Dr. Morton screened Ms. Husted for depression, anxiety, and mania. *Id.* at 327. She screened positive for depression with the symptoms of "sleep disturbance, appetite disturbance, irritability, tearfulness, loss of concentration," among other symptoms. *Id.* She also screened positive for anxiety—she had "panic episodes triggered by her irrational fear of social situations." *Id.* She also screened positive for mania—she reported experiencing symptoms of mania roughly seven days per month at an intensity of seven out of ten. *Id.* Ultimately, Dr. Morton found that Ms. Husted had moderate limitations in regard to "carrying out instructions" and interacting appropriately with supervisors, co-workers, and the public." *Id.* at 328. He

5

found that she had mild limitations regarding "remembering and understanding instructions, procedures, and locations," and "using good judgment and responding appropriately to changes in the workplace." *Id.*

On January 12, 2015 Dr. Velma Campbell completed a physical examination of Ms. Husted. *See id.* at 473. Dr. Campbell noted that Ms. Husted did not exhibit any pain or distress in sitting during the examination. *Id.* at 476. In Dr. Campbell's opinion, Ms. Husted was limited to carrying ten pounds or less for up to three hours per day. *Id.* at 477. She found that Ms. Husted was limited to reaching above shoulder height to less than one hour per day. *Id.* She found that Ms. Husted should limit her walking and standing to thirty minutes per day for a total of three hours in an eight-hour period. *Id.* She found that due to the neck spasm and pain she would be limited in squatting or kneeling to less than two hours a day. *Id.* She found that Ms. Husted should be limited in manipulation of small objects and fine coordination of the hands to three hours per day. *Id.* Dr. Campbell also found, that due to Ms. Husted's report of seizures, she should not drive a personal or commercial vehicle. *Id.* Additionally, due to Ms. Husted's prior diagnosis with asthma, Dr. Campbell found that Ms. Husted should limit her exposure "to extremes of climate or irritating dusts, fumes, or vapors." *Id.*

### C.  Opinions from Non-Treating or Examining Providers

Four other doctors also opined on Ms. Husted's case—Drs. McElhinney, Suyeishi, Koutrakos and Landwehr did not examine Ms. Husted in person but reviewed her medical records in forming their opinions on her limitations. *See id.* at 332–334, 1258. Dr. McElhinney found that Ms. Husted could frequently lift and carry up to ten pounds and occasionally lift and

carry up to twenty.  *Id.* at 60.  He found that she could only stand or walk for six hours of the eight-hour workday and limited to sit for six hours of the eight-hour workday.  *Id.*  He found Ms. Husted was frequently limited in climbing stairs or ramps and stooping, and occasionally limited in climbing ladders, ropes, or scaffolding.  *Id.* at 60–61.

Dr. Suyeishi considered Ms. Husted's alleged mental limitations.  He gave an opinion that Ms. Husted had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, and pace.  *Id.* at 58.  He found that she had medically determinable impairments of depression and anxiety.  *Id.*

Dr. Koutrakos also opined regarding Ms. Husted's mental health issues on November 18, 2019.  *Id.* at 1256.  Dr. Koutrakos considered all the medical records and concluded that Ms. Husted had no more than mild limitations for any of the four paragraph B criteria to be considered when determining whether a mental impairment is severe.  *Id.* at 1258.  Dr. Koutrakos found that Dr. Morton's analysis was vague and not well supported by the weight of the evidence, though she still considered it.  *Id.*  She found that Ms. Duba's opinions that Ms. Husted only had mild limitations in the paragraph B criteria were supported by the overall record.  *Id.* at 1257.  She found that Dr. Suyeishi's opinion that Ms. Husted could carry out simple instructions with minimal or no interaction with the public was inconsistent with the evidence.  *Id.* at 1256.  Likewise, she found his opinion that Ms. Husted was moderately limited in three of the paragraph B criteria (understanding and memory, concentrating, persisting, or maintaining pace, and adapting or managing oneself) were inconsistent with the record.  *Id.*

Dr. Landwehr gave an opinion on November 18, 2019. *Id.* at 1255. He found that Ms. Husted should be limited to lifting and carrying ten pounds occasionally and frequently. *Id.* He found that Ms. Husted could sit for six hours in an eight-hour day and that she could stand for two hours of an eight-hour day. *Id.* He found that she could occasionally bend, squat, kneel, reach overhead, and use foot controls. *Id.* He found that she should not climb ropes or scaffolds. *Id.*

### D. The ALJ's Findings

The ALJ conducted a hearing in which she admitted medical opinions and medical records. An impartial vocational expert also testified at the hearing. Following the hearing and a review of the medical record, the ALJ found that Ms. Husted did not have a qualifying disability. In reaching this opinion, she applied the five-step sequential process. At step one, the ALJ found that Ms. Husted had not engaged in substantial gainful activity since the date that she first applied for these benefits. *Id.* at 500. At step two, she found Ms. Husted had two severe impairments: disorders of the lumbar and cervical spine and asthma. *Id*. at 501. She noted that these impairments "significantly limit [Ms. Husted's] ability to perform basic work activities." *Id*. At this step, she found that though Ms. Husted had medically determinable mental impairments of depression and anxiety, these impairments "did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore nonsevere." *Id.* She made this determination based on the "broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments," specifically using the "paragraph B" criteria. *Id.*

8

At step three, the ALJ found that Ms. Husted's impairments, viewed singly or together, did not meet or medically equal the severity of one of the listed impairments. *Id*. at 16. Accordingly, the ALJ proceeded to step four where she found that Ms. Husted had a residual functional capacity ("RFC") to perform sedentary work, as defined in 20 C.F.R. §§ 404.1567(a), except that she can lift and carry ten pounds occasionally and ten pounds frequently. *Id.* at 506. Based on her review of the medical record, the ALJ concluded that Ms. Husted

> [I]s able to stand or walk, with normal breaks, for a total of[two] hours in an [eight]-hour workday and could sit, with normal breaks, for a total of [six] hours in an [eight]-hour workday. The claimant could perform pushing and pulling motions with upper and lower extremities within the weight restrictions given. However, the bilateral lower extremities could only occasionally perform pushing and pulling. The claimant should avoid unprotected heights and moving machinery. The claimant should be restricted to a "relatively clean" work environment (meaning low levels of pollutants). The claimant could perform the following postural activities frequently: climbing of ramps or stairs and stooping. The claimant should not climb any ladders, ropes, or scaffolds on the job. The claimant could occasionally perform bending, squatting, and kneeling. The claimant could perform bilateral overhead reaching occasionally.

*Id.* at 506.

The ALJ concluded that Ms. Husted had an underlying medically determinable physical impairments that could be reasonably expected to produce her pain or other symptoms. *Id.* at 508. However, the ALJ did not find Ms. Husted's statements about the intensity, persistence, and limiting effects of those symptoms to be entirely consistent with the medical record. *Id.* The ALJ found Ms. Husted's statements inconsistent because she started to "engaged in a number of activities that were not consistent with the severity of the reported symptoms and undercut a finding of total disability." *Id.* Overall, the ALJ found that the record did not support Ms. Husted's statements about the intensity, persistence, and limiting effects of her symptoms.

The ALJ concluded that Ms. Husted could perform sedentary work.  In reaching her conclusion, the ALJ reviewed the objective medical evidence and the medical providers' opinions.

Concerning Ms. Husted's potential mental limitations, the ALJ found that they did not reach the level of a severe impairment.  She assigned little weight to the opinions rendered by Drs. Morton and Suyeishi.  *Id.* at 504.  The ALJ assigned Dr. Morton's opinion little weight because he had assessed Ms. Husted a moderated limitation in interacting with supervisors, co-workers, and the public—she found that this limitation was not supported by the record.  *Id.*  She assigned little weight to Dr. Suyeishi's opinion because it used "[out-of-date] criteria that are no longer used by the Social Security Administration."  *Id.*  The ALJ was clear that, despite the out-of-date criteria, she still considered Dr. Suyeishi's opinion, even if she assigned it little weight. *Id.*  Ultimately, she found that Ms. Husted's mental impairments constituted only mild limitations.

As to Ms. Husted's physical impairments, the ALJ gave partial weight to the opinion of Dr. Moran—she found his opinion only partially consistent with the record.  *Id.* at 512.  The ALJ gave minimal weight to the opinion of Dr. Callen—she found that not only was Dr. Callen's opinion inconsistent with the record, that opinion was inconsistent with Dr. Callen's own records.  *Id.* at 513.  The ALJ gave very little weight to physician assistant Lee because Ms. Lee gave an opinion that there was no evidence that would warrant Ms. Husted having "permanent stationary disability.  *Id.* at 513.  That opinion is on an issue reserved to the commissioner, and further, Ms. Lee, as a physician assistant, is not an acceptable medical source.  *Id.*  The ALJ gave

partial weight to Dr. Campbell because she found that Dr. Campbell's assessed limitations were inconsistent with the weight of the evidence. *Id.* at 514. The ALJ gave significant, but not full weight to Dr. McElhinney's opinions. *Id.* at 515. This was because the ALJ found Dr. McElhinney's findings consistent with the record as it existed when he reviewed the records, but the records obtained in the time since supports greater restrictions than he found. *Id.* The ALJ gave great weight to the opinion of Dr. Landwehr; though Dr. Landwehr did not examine or treat Ms. Husted, the ALJ found that his opinion was well supported by the record. *Id.*

The ALJ determined that Ms. Husted could perform certain jobs. *Id.* At 16-17. The vocational expert, considering Ms. Husted's limitations, found that she could perform the jobs of information clerk, marking clerk, and assembly worker. *Id.* At 21. As a result, the ALJ found that Ms. Husted did not have a qualifying disability under the Social Security Act. In response to her being denied benefits, plaintiff filed suit in this Court. She now asks this Court to reverse and remand the ALJ's denial of benefits.

## II.  STANDARD OF REVIEW

A person is disabled within the meaning of the Social Security Act only if her physical and/or mental impairments preclude her from performing both her previous work and any "substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2). To be disabling, a claimant's conditions must be so limiting as to preclude substantial gainful work for at least twelve consecutive months. *See Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995).

This appeal is based upon the administrative record and the parties' briefs. In reviewing a final SSA decision, the District Court examines the record and determines whether it contains

substantial evidence to support the decision and whether the SSA applied correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). The district court's determination of whether the ruling by the Administrative Law Judge ("ALJ") is supported by substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). A decision is not based on substantial evidence if it is "overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Reversal may also be appropriate if the Commissioner applies an incorrect legal standard or fails to demonstrate that the correct legal standards have been followed. *Winfrey*, 92 F.3d at 1019.

## III. ANALYSIS

### A. The ALJ's Consideration of Medical Opinions

Plaintiff argues that the ALJ did not give sufficiently specific reasons for assigning little weight to Dr. Campbell's opinions on her physical restrictions and Dr. Morton's opinions on her mental limitations. ECF No. 18 at 12. I disagree.

The regulations governing disability determination proceedings state that "[i]f any of the evidence in your case record, including any medical opinion(s) and prior administrative medical findings, is inconsistent, we will consider the relevant evidence and see if we can determine whether you are disabled based on the evidence we have." 20 C.F.R. § 404.1520(b). Furthermore, when an ALJ evaluates the persuasiveness of medical opinions, "[t]he most important factors [she] considers [are] supportability. . . and consistency." *Id.* § 404.1520(c).

Regarding supportability, the regulations explain that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical findings will be." *Id.* § 404.1520(c)(1).  The consistency factor is described as follows: "[t]he more consistent a medical opinion[s] or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520(c)(2).

Typically, ALJs need only analyze the supportability and consistency factors when evaluating how much weight to give a medical opinion.  An ALJ must "'give good reasons in [the] notice of determination or decision' for the weight assigned to a treating physician's opinion." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)(quoting C.F.R. § 404.1527(d)(2)).  Additionally, the decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight." *Id.* (quoting Social Security Ruling 96-2p, 1996 WL 374188 at *5).  If an ALJ decides that a medical opinion is unsupported by medical evidence or inconsistent with the record, that medical opinion is not entitled to controlling weight.  *Id.*  It still must be assigned some weight because medical opinions are entitled to some deference, even when inconsistent with the rest of the record.  *Id.*

13

1.  The ALJ's Rejection of Some of Dr. Campbell's Physical Restrictions

Ms. Husted argues that the ALJ erred in assigning only partial weight to the opinion
rendered by Dr. Campbell.  The ALJ assigned only partial weight to Dr. Campbell's opinion for
two reasons: (1) Dr. Campbell found Ms. Husted had a limitation in manipulation, and (2) Ms.
Husted's activity level was inconsistent with the level of limitations that Dr. Campbell found.  *Id.*
at 514.

The ALJ took issue with Dr. Campbell's assessment of manipulation limitations because it
was not consistent with other testimony and information from Ms. Husted.  *See id.*  Ms. Husted
testified in 2019 and indicated in papers submitted in 2013 that she did many activities that
required manipulation.  At the 2019 hearing before the ALJ, Ms. Husted testified that she had
hobbies of "needlepoint, crochet, and cross stitch."  *Id.* at 534.  She wrote that she had those
same hobbies on the Adult Function Report she submitted on September 24, 2013.  *Id.* at 164.
Though Ms. Husted indicated that she had some difficulties finishing needlepoint projects, she
made clear that her inability to finish was related to concentration issues.  *Id.* at 41.  She did not
indicate that she experienced any pain in her hands during those activities.  *Id.*  The substantial
evidence supports the ALJ's assignment of limited weight to Dr. Campbell—a limitation
regarding manipulation is not consistent with the evidence.

The ALJ also found that to the extent Dr. Campbell's report was inconsistent with other
evidence, it should also be accorded less weight.  Dr. Campbell found that that Ms. Husted
should limit her walking and standing to thirty minutes per hour for a total of three hours in an
eight-hour period.  *Id.* at 477.  The ALJ found that this level of limitation was inconsistent with
the activity level about which Ms. Husted testified.  *Id.* at 514.  Ms. Husted testified at various

14

times that she was able to cook, do laundry, make her bed, and vacuum. *See e.g., id.* at 544. While she did state that she does not often leave her house, she attributed that to her anxiety and not to any concerns about her physical ability to be out and about. *Id.* at 39. Though she reported to the former ALJ at the hearing in 2018 that she could only stand for ten minutes at a time, *id.* at 575, no medical report indicates that she had any difficulty standing or sitting while she was being observed. *See e.g., id.* at 252. There are some other inconsistencies between Dr. Campbell's findings and the evidence in the record. Dr. Campbell found that Ms. Husted could not drive, but there is evidence that she drove to many medical and mental health appointment, once driving herself thirty-two miles. *Id.* at 326. Further, as the ALJ noted, there are internal inconsistencies in Dr. Campbell's opinion. *Id.* at 514. In her initial discussion of Ms. Husted on January 12, 2015, Dr. Campbell found that walking and standing should be limited to thirty minutes at a time for up to three hours of an eight-hour day. *Id.* at 477. But when she filled out the residual functional capacity form on March 6, 2015 regarding Ms. Husted, she opined that Ms. Husted could only on stand or walk for thirty minutes at a time for up to two hours. *Id.* at 478. It was not counter to the substantial evidence in this case for the ALJ to assess only partial weight to Dr. Campbell's opinion.

2. <u>The ALJ's Rejection of Dr. Morton's Mental Limitations</u>

Dr. William Morton saw Ms. Husted for a psychological examination on December 24, 2013. At that evaluation, he found that Ms. Husted had "mild mental limitations in regard to remembering and understanding instructions, procedures, and locations," and moderate mental

limitations in regard to "carrying out instructions" and "interacting appropriately with supervisors, co-workers, and the public." *Id.* at 328.

The ALJ found that the evidence in the record did not support Dr. Morton's finding that Ms. Husted had a moderate limitation in "carrying out instructions." *Id.* at 503. She gave that opinion little weight. *Id.* The substantial evidence supports the ALJ's analysis on this point. As the ALJ noted, Ms. Husted had driven thirty-two miles to attend her appointment with Dr. Morton, which would involve the carrying out of instructions to drive successfully. *Id.* at 326. Dr. Morton noted that Ms. Husted's thinking ability was in normal limits, and that her intellectual ability was in normal range. *Id.* at 327. These findings do not show any indication that Ms. Husted has a moderate limitation on following instructions.

The ALJ also assigned little weight to Dr. Morton's opinion that Ms. Husted was moderately limited in "interacting with supervisors, co-workers, and the public." *Id.* at 503. This was because the ALJ believed this opinion was also not supported by the evidence. The ALJ's decision to grant little weight to this opinion of Dr. Morton was supported by the substantial evidence. Dr. Morton noted that when he evaluated Ms. Husted, she was nervous and "mildly agitated." *Id.* at 327. However, she reported engaging in various social activities such as chatting online and, on the phone, daily and occasionally going out to dinner. *Id.* at 164, 537. Providers noted that Ms. Husted did not appear to be in any distress when they examined or evaluated her. *See e.g., id.* at 321. The ALJ also considered that Ms. Husted claimed to have significant anxiety when she left the house. *See e.g., id.* However, as the ALJ noted, there is no evidence that Ms. Husted was unable to attend her physical medical appointments without

rescheduling.  Attending fairly frequent doctors' appointments and talking with friends every day are not consistent with a moderate limitation on interacting with supervisors, co-workers, and the public.

On the whole, the ALJ's decision to give little weight to Dr. Morton's opinion is supported by the substantial evidence.  The substantial evidence indicates that while Ms. Husted had some limitations as a result of her anxiety and depression, those limitations are more appropriately classified as mild rather than moderate.

### B.  The ALJ's Assessment of the Effect of Ms. Husted's Symptoms on her RFC

The ALJ's assessment of Ms. Husted's RFC was not counter to the substantial evidence. Ms. Husted argues that the ALJ did not sufficiently consider Ms. Husted's testimony as to the intensity, persistence, and limiting effects of her symptoms.  ECF No. 18 at 12.  The ALJ found that Ms. Husted's statements regarding intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence.  ECF No. 14 at 508.  This conclusion is supported by the substantial evidence.

Ms. Husted argues that the ALJ cited medical records for the proposition that Ms. Husted's testimony regarding the intensity and persistence of her symptoms contradict Ms. Husted's other testimony, but those citations are in accordance with the medical evidence. However, this argument misunderstands the ALJ's position.

For instance, Ms. Husted argues that the ALJ found Ms. Husted was inconsistent because she told medical providers that was able to do daily self-care.  Ms. Husted argues that this is completely consistent with her testimony before the ALJ; at the administrative hearing she

indicated that she was able to care for herself as well.  However, the problem the ALJ had with Ms. Husted's statements regarding her personal care is that they were inconsistent with her broader statements regarding her ability to sit, stand, and walk and the amount of daily pain that she experienced during the period at issue.  The ALJ and Ms. Husted agree that Ms. Husted was "independent in activities of daily living including personal care activities, including driving, preparing simple meals, housecleaning, vacuuming, and doing laundry."  *Id.* at 508.  The ALJ's point was not that Ms. Husted said that she could not do those things.  The ALJ's point was that the ability to perform these activities is not consistent with the debilitating nature of the pain as described by Ms. Husted at the administrative hearing.  While Ms. Husted claims that the ALJ failed to identify the statements of Ms. Husted that she found not credible, I believe she did.

Ms. Husted next argues that the ALJ never determined how Ms. Husted's symptoms limited her capacity to work, nor did she even identify what specific symptoms Ms. Husted had. ECF No. 18 at 19.  On the contrary, I find that the ALJ did outline how Ms. Husted's symptoms would limit her ability to work.  The ALJ wrote, "because of disorders of the lumbar and cervical spine and asthma, the claimant had a reduced ability to work."  ECF No. 14 at 515.  She went on to outline the ways that those disorders limited Ms. Husted's functional capacity by clearly defining her RFC.  *Id.*  For instance, by saying that Ms. Husted could lift or carry up to ten pounds frequently, the ALJ is functionally saying that Ms. Husted's symptoms affect her ability to carry more than ten pounds frequently.  The ALJ did consider how Ms. Husted's symptoms would limit her capacity to work, as she was required to do.

As for a "finding" of symptoms by the ALJ, the ALJ considered all the symptoms alleged by Ms. Husted.  She wrote "the claimant engaged in a number of activities that were not consistent with the severity of the *reported* symptoms and undercut a finding of total disability." *Id.* at 508 (emphasis supplied).  This shows the symptoms considered were those reported by Ms. Husted—the ALJ did not make a finding on which symptoms actually existed, she analyzed whether the intensity, persistence, and limiting effects of these symptoms were supported by the medical evidence.  The ALJ did not err on this point.

## ORDER

For the reasons discussed above, the Court AFFIRMS the Commissioner's decision denying Ms. Husted's application for SSDI benefits.

DATED this 20th day of December, 2021.

BY THE COURT:

_____

R. Brooke Jackson
Senior United States District Judge